# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

**DEBORAH RUSSELL**
    **Plaintiff**

*03-22  0574*

Case No._____

**JURY DEMANDED (12)**

**v.**

**WILLIAM C. KILLIAN, JOHN C. CAVETT,**
**BARRY L. ABBOTT and**
**CAVETT, ABBOTT & WEISS, PLLC.**
    **Defendants**

## <u>VERIFIED COMPLAINT</u>

Comes now, Deborah Russell, PLAINTIFF, *pro se,* and herewith files this Verified

Complaint for damages and injunctive relief and the following causes of action against

the Defendants, William C. Killian (Killian), individually and as a representative and

agent of Defendant Cavett, Abbott and Weiss, PLLC, John C. Cavett (Cavett),

individually and as a representative and agent of Defendant Cavett, Abbott & Weiss,

PLLC, and Barry L. Abbott (Abbott), individually and as a representative, managing

partner/member and as agent of Defendant Cavett, Abbott & Weiss, PLLC, and

Defendant Cavett, Abbott & Weiss, PLLC (the law firm/firm), a corporation/company

conducting business as a law firm in the state of Tennessee.

## <u>NOTICE</u>

This VERIFIED COMPLAINT has been filed **UNDER SEAL.** The Affidavits of

Deborah Russell, contemporaneously filed in support thereof have also been filed

**UNDER SEAL.** The pertinent motions are accompanied by requisite memorandums of law, pursuant to LR5.07 and LR7.01, setting forth the substantive legally recognized privilege, i.e., client privilege as appropriate for filing documents under seal.

Plaintiff's claims directly resulted from the conduct of the Defendants while acting in their individual and collective roles as licensed counsels and law firm of record during their representation of their client, Russell. In order, for Plaintiff to state the factual basis of her legally cognizable claims, she was required to provide significant, sensitive details about the facts that gave rise to said claims. The detailed facts required inclusion of client privileged information and communications between Russell and her former licensed counsels and law firm of record for the purpose of demonstrating the Defendants' fraud and violations of their fiduciary duties to their client, Russell.

Filing these matters UNDER SEAL is appropriate and necessary to preserve Russell's client privilege, which **she** has **not** waived, intentionally or inadvertently.

Plaintiff filed these matters UNDER SEAL in good faith to mitigate damages and reasonably prevent additional unnecessary, irremediable damages, as well as, to attempt to protect any legal rights in the original litigation in which these Defendants acted as licensed counsels of record, in the event, that some of the Plaintiff's rights and claims in that cause may be salvageable and/or may not have yet been irreparably damaged by these Defendants. Plaintiff's legal rights must be protected during the course of pursuing legal remedy for damages she has already been forced to incur.

Filing UNDER SEAL likewise affords the Defendants the opportunity to attempt to cooperatively mitigate their own liability, and is in the interests of all parties, for good

and reasonable cause fully set forth in said motions.

## **THE PARTIES**

1.      PLAINTIFF, Deborah Russell (Plaintiff/Russell), is an individual, United States citizen and resident of Davidson County, Tennessee.  Mailing address:  P.O. Box 121333, Nashville, TN 37212.

2.      DEFENDANT, William C. Killian (Killian), is a licensed attorney, practicing law in the state of Tennessee at the law firm of Cavett, Abbott & Weiss, PLLC, located at 801 Broad Street, Suite 428, Chattanooga, TN 37402, where he maintains a physical office, conducts business, receives mail and other communications and as well as other communal benefits, including services and support staff at the law firm.

3.      Killian is a citizen and resident of Hamilton County, Chattanooga, Tennessee, and is sued in his individual capacity and as *"Of Counsel"*, representative and as agent of Cavett, Abbott & Weiss, PLLC.

4.      DEFENDANT, John C. Cavett (Cavett), is a licensed attorney, practicing law in the state of Tennessee at the law firm of Cavett, Abbott & Weiss, PLLC, located at 801 Broad Street, Suite 428, Chattanooga, TN 37402, where maintains a physical office, conducts business, receives mail and other communications, as well as, other communal benefits, including services of support staff.  Cavett is the first named partner/member of the law firm.

5.  Cavett is a citizen and resident of Hamilton County, Chattanooga, Tennessee and is sued in his individual capacity, as representative and agent of Defendant Cavett, Abbott & Weiss, PLLC.

6. DEFENDANT, Barry L. Abbott, is a licensed attorney, practicing law in the state of Tennessee at the law firm of Cavett, Abbott & Weiss, PLLC, located at 801 Broad Street, Suite 428, Chattanooga, TN 37402, where he maintains a physical office, conducts business, receives mail and other communications, as well as, other communal benefits, including services of support staff. Abbott is the second named partner/managing partner-member of and registered agent for service of process for of the law firm.

7. Abbott is a citizen and resident of Hamilton County, Chattanooga, Tennessee, and is sued in his individual capacity, as representative, managing partner/member, and agent of Defendant Cavett, Abbott & Weiss, PLLC.

## JURISDICTION & VENUE

8. This Court has proper original subject matter jurisdiction pursuant to 28 USC 1331, 28 USC 1391 and 42 USC 1983. This Court has jurisdiction over these claims and because the acts were committed in a federal proceeding and a state proceeding and all applicable state law claims because they arise from the same core set of facts and circumstances as the violations of federal law, and directly result from the Defendants' violations of the following:

   a. Fraud
   b. Wire Fraud - 18 USC 1343 and 1349
   c. Conspiracy - 18 USC 241, 18 USC 1349
   d. Fraudulent concealment , intentional omission, malicious non-disclosure, reckless non-disclosure
   e. Misrepresentation, -false representation
   f. Deception TCA 39-14-127(a),
   g. Intent to induce reliance
   h. Slander
   i. Defamation

j. Obstruction of justice
k. Legal malpractice

9.    Venue is proper under the authority of 28 USC 1391(b)(1)(2) because all events

giving rise to the Plaintiff's claims occurred in this district and the defendants reside

and/or do business in this district.

## **FACTS**

10.    Killian's professional resume, biographical information, list of skills, services,

background, educational information, lists of accomplishments, business associations

and image and likeness are publicly published on the website of Cavett, Abbott & Weiss,

PLLC.

A copy of Killian's page on the Cavett, Abbott & Weiss, PLLC website is incorporated

by reference as if fully set forth verbatim herein and attached hereto as **EXHIBIT #1.**

11.    Killian's name is included on the Cavett, Abbott & Weiss, PLLC's publicly

published website address:  https://www.cawpllc.com.  This website address is preceded

by the letters "www" signifying "worldwide web".

12.    On information and belief, the law firm website was intentionally prepared to

voluntarily establish a presence on the internet (worldwide web), is maintained by the

law firm with the intent and for the expressed purpose of advertising legal services

provided by the individual licensed attorneys collectively and individually that comprise

the law firm, listing each named associate/agent/representative of Cavett, Abbott &

Weiss, PLLC, under banner of the law firm of Cavett, Abbott & Weiss, PLLC., for the

expressed purpose of soliciting members of the general public, i.e., consumers, seeking

the legal services offered on said website.

13.    On information and belief the licensed attorneys, Cavett, Abbott & Weiss that comprise the named partners/members of the law firm, either participated in, contributed to and/or have knowledge of the content of the representations made in the statements publicly published on the Cavett, Abbott & Weiss, PLLC website.

14.    The Cavett, Abbott & Weiss, PLLC website advertises that it offers "consultations" to consumers/members of the general public for the purpose of evaluating cases, before entering into contracts and/or agreements with clients for legal representation.

15.    Cavett, Abbott & Weiss, PLLC's website, is without restrictions and/or any disclaimers, warnings or disclosures as to any of its "*team members*" inability, incapacity and/or unfitness to perform the legal services as advertised.

16.    Killian's name is listed under the tab on the law firm's website labeled: *"About"*.

17.    Under the *"About"* tab, the subtitle reads *"Meet the Team"*. Killian's name is listed on the roster of attorneys identified by and under the title: *"Meet the Team"*.

18.    No disclosures, restrictions, warnings, notice of physical or mental disabilities, physical illnesses, mental illnesses or diminished capacity of any nature, addictions, disclaimers distinguishing mark or asterick or any other symbol appears, either before or after any of the names of any of the *team members* listed on the Cavett, Abbott & Weiss, PLLC website.

19.    Nothing on the website discloses, suggests, warns, directly or indirectly, that a potential client/consumer should be concerned about the truthfulness of representations in the statements made on the Cavett, Abbott & Weiss, PLLC website.

20. The Cavett, Abbott & Weiss, PLLC website does not warn or advise legal consumers reviewing the statements on its website that they should seek additional information from an independent source to verify the truthfulness and/or accuracy of the representations made on the website about capabilities, skills, truthfulness or accuracy of the personal biographical, professional qualifications represented in statements made by any of the individual pages of any of the *team members* identified on the website.

21. No disclosures, restrictions, warnings, notices of physical or mental disabilities, physical illnesses, mental illnesses or diminished capacity of any nature, addictions, disclaimers distinguishing marks or astericks or any other symbol appears, either before or after Defendant Killian's name as a *team member* listed on the Cavett, Abbott & Weiss, PLLC website.

22. The biographical and professional information, court/jurisdictional admissions, and all items listed on Defendant Killian's page accessed via the *"About"* and *"Meet the Team"* tabs on Cavett, Abbott & Weiss, PLLC's website, contain substantially more listings and contains approximately three times the itemized information as a *team member* than any of the three named partners, Cavett, Abbott & Weiss.

23. At all times relevant hereto, Killian was a licensed Tennessee attorney, representative, *"team member"* and agent of Cavett, Abbott & Weiss, PLLC with a prominent presence on and soliciting clients and cases through the law firm's website.

24. DEFENDANT, John C. Cavett (Cavett), is a licensed attorney, at the law firm of Cavett, Abbott & Weiss, PLLC., located at 801 Broad Street, Suite 428, Chattanooga, TN

37402.

25.     Cavett is the first named partner/member of the law firm, Cavett, Abbott &
Weiss, PLLC.

26.     Cavett is sued in his individual capacity and as a partner, member and agent of
the law firm Cavett, Abbott & Weiss, PLLC.

27.     Defendant John Cavett's biographical, professional, court/jurisdictional
admissions, educational, legal background, list of accomplishments, business
associations and image and likeness are publicly published on the law firm's website.

      A copy of Cavett's page as it appears on the Cavett, Abbott & Weiss, PLLC's website
is incorporated, as if fully set forth verbatim herein and attached hereto,

 as **EXHIBIT #2.**

28.     Defendant Barry L. Abbott's biographical, professional and court/jurisdictional
admissions, educational, legal background, list of accomplishments, business
associations and image and likeness are publicly published on the law firm's website.

      A copy of Abbott's page as it appears on the Cavett, Abbott & Weiss, PLLC's website
is incorporated, as if fully set forth verbatim herein and attached hereto,

 as **EXHIBIT #3.**

29.     As part of the brand of the law firm of Cavett, Abbott & Weiss, PLLC., and
prominently featured directly under the name of the firm, emblazoned across the
photograph on the law firm's website home page featuring a full page of the three named
partners/members of the firm, John C. Cavett is pictured (left), standing next to
Barry L. Abbott, (center) managing partner/member & registered agent for service, and

Joshua P. Weiss, (right) the third named partner/member of the firm.

30.     Cavett, Abbott & Weiss, PLLC, developed and publicly publishes on their website, the slogan: *"You can't afford to go to court without us!"*®.

A copy of the law firms's registered trademarked slogan/statement/declaration, is incorporated as if fully set forth verbatim herein and attached hereto as **EXHIBIT #4.**

31.     The symbol "®" positioned after the exclamation point in the foregoing branding statement/slogan/declaration, represents a legal designation of a "Registered" "Trademark" for the specific language in that statement.

32.     Abbott's name appears under the tab *"About"* and is listed under the title: *"Meet the Team"*.

33.     From mid-May, 2021 through and as of the date of filing this Verified Complaint, no disclosures, corrections, changes, alterations, warnings have been made to the Cavett, Abbott & Weiss, PLLC website, to advise any prospective clients that the representations made in the statements on the firm's website contains false or misleading statements and information.

## RELEVANT BACKGROUND
### (about the case in which Cavett, Abbott & Weiss were counsels/law firm of record representing Russell)

34.     In 2006 Russell filed suit against the Hong Kong Shanghai Bank of China (HSBC) for the wrongful foreclosure on her home and real property, following the refinance on her existing mortgage with the lender.  Russell's litigation against HSBC was one of hundreds of thousands across the country who's loan documents were involved in the widespread mortgage fraud scheme by lenders using forged consumer

loan documents bundled together and sold those fraudulent documents to investors as *"asset-backed mortgage investments"* that resulted in the nationwide economic and real estate stock market crash in 2008.

35.     As the defendant in that state court case in Davidson County, Tennessee, HSBC was represented by licensed attorney, Jonathan Cole of the law firm Baker Donelson. That state trial court litigation languished from 2006 through the present and is still pending as of the date of filing this case sub judice. There have been two appeals in the Tennessee Court of Appeals. In both appeals, Russell proceeded *pro se.* The first appeal *Deborah Russell v. SouthStar Funding, LLC, Household/HSBC, et al.,* case No. M2008-01703-COA-R3-CV was remanded to the trial court on June 7, 2012. The second appeal, *Deborah Russell v. HSBC, et al.,* case No. M2015-00197-COA-R3-CV, was remanded to the trial court in June 2016. The third appeal was again filed by Russell, *pro se,* in 2020, case No. M2020-01181-COA-R3-CV, oral argument was held on February 3, 2022, currently awaiting release of the opinion.

36.     At the end of November 2016, Russell began renting from landlords, Carol and Thomas Tanner. The Tanners were aware of Russell's litigation against HSBC and knew that HSBC was represented by Cole/Baker Donelson.

37.     In November and December 2019, Russell was housesitting for a friend and was not staying at her leased premises. This was known to Carol Tanner, Thomas Tanner and Cole. Cole asked Carol Tanner and Thomas Tanner to assist him in obtaining information and property of Russell's located in Russell's leased premises in Carol and Thomas Tanner's home. Cole's expressed intent was to obtain private and confidential

information and property that he believed could be used against Russell in her suit against Baker Donelson's client, HSBC, in the state litigation.

38.     Licensed attorney Cole told Carol Tanner that he (or Baker Donelson) would pay her for assistance in stealing Russell's property and information.  Carol Tanner prepared a handwritten affidavit stating that Cole paid her $5,000, but he paid her more than that amount.  Cole's explanation to Carol and Thomas Tanner was that he intended to use the information to the advantage of his client, HSBC in the state litigation.

39.     In November and December 2019 Carol Tanner went into Russell's leased premises, without Russell's knowledge or permission, and at Cole's request sent him confidential, private and proprietary information, trade secrets and documents that belonged to Russell.

40.      During November 2019 or December 2019, on at least one occasion, Cole and Carol Tanner went into Russell's leased premises, without her knowledge or consent. While there, they made copies of Russell's private, confidential and proprietary documents on Russell's printer.  At some point the printer ran out of ink and thereafter Cole and/or Carol Tanner tried to replace the ink cartridge to no avail.  They then stole a box of notebooks and documents belonging to Russell without her knowledge or consent.   In addition to the documents Cole wanted to use in case against his client HSBC, the box contained proprietary and confidential information and trade secrets unrelated to the HSBC case.

41.      Russell was, at that time, entering into negotiations with potential partners, investors and/or purchasers with respect to her trade secrets, confidential and

proprietary information, intellectual properties.

42.    Cole, Carol Tanner, Thomas Tanner and Baker Donelson engaged in numerous communications through several different means, including telephone calls, texts and emails both prior to the theft of Russell's property, and after to disseminate and publish the confidential proprietary information and trade secrets that they stole from Russell.

43.    Carol Tanner, Thomas Tanner and licensed attorney Cole, individually and on behalf of Baker Donelson and their client HSBC, also stole Russell's personal prayer journals, confidential medical records, financial records, banking records, and Social Security information, in addition to her proprietary and confidential information and trade secrets which concern 3D bioprinting and includes original creations, drawings, writings, research and numerous other creative projects.

44.    In addition to the foregoing injuries and damages Russell suffered as the result of the theft, in an effort by these participants in the theft of Russell's belongings, Cole, Carol and Thomas Tanner concocted a scheme to fabricate a *defense* to Carol Tanner's admissions made in her handwritten affidavit that was notarized by an impartial, independent notary public, in said affidavit Carol Tanner directly named Cole as her co-conspirator and thief.

45.    Cole initiated and instigated a fabricated and entirely false accusation against Russell to attempt to cover his participation in the theft of Russell's proprietary property.  Although, Cole was not present when Carol Tanner voluntarily prepared her handwritten affidavit naming him as her co-conspirator and the person that paid her to access Russell's leased space, Cole used his personal, professional influence and

connections by and through his position with Baker Donelson to have Russell falsely accused, falsely arrested and maliciously prosecuted and falsely imprisoned in an environment during which the COVID 19 virus was raging, intentionally exposing Russell to the deadly virus, after having stolen Russell's confidential medical information which evidenced that she has a suppressed autoimmune disease which placed her a greater than average risk of contracting the deadly virus.

46.     Russell's arrest was orchestrated and occasioned by Cole and the charges falsely asserted included perjury based on statement Russell made, all of which came directly from the sworn statements made by Carol Tanner in her notarized affidavit.

## FACTUAL HISTORY OF RELATIONSHIP BETWEEN PLAINTIFF AND DEFENDANTS

47.     In consideration of the foregoing incidents, Russell filed the federal litigation against Cole, Baker Donelson, Carol Tanner and Thomas Tanner on November 30, 2020.

48.     Russell's personal experiences had well informed her of the type of criminal actions and extreme acts that licensed attorney Cole and the law firm Baker Donelson had already engaged in, in their relentless attempts to discredit her truthful, factual pleadings in the state case to try to gain an illegal advantage in the still-pending state case against their client, HSBC.

49.     After filing the federal litigation against Cole, Baker Donelson, Carol and Thomas Tanner on November 30, 2020, and after being falsely arrested on December 15th, 2020 (15 days after filing suit and 15 days prior to the deadline for these defendants

to file their response to the litigation about their theft of Russell's trade secrets and intellectual properties), Russell continued to pursue her claims in that cause.

50.     Russell had already made progress in the case against Cole and the Tanners, the court had placed a stay on attempts by Cole/Baker Donelson's efforts to force specific details of Russell's trade secrets, proprietary confidential and intellectual properties into the public record by abusing discovery in that cause.

51.     Metropolitan Nashville Davidson County, the city of Nashville, the Metropolitan Nashville Davidson County Police Department, Sheriff's Department, Nashville Davidson County Board of Education are each/all clients of Baker Donelson in their role as outside legal counsel, often engaged as legal co-counsel to the city's inhouse staff legal counsel.

52.     Licensed attorney Jonathan Cole, as agent of Baker Donelson routinely and nearly exclusively acts as licensed counsel of record representing numerous individual members of the judiciary of the Davidson County trial courts, in their personal legal matters. Cole/Baker Donelson's legal representation of these judges in their personal legal matters include, but not limited to, divorces, probating wills, automobile accidents, contractual disputes and before the Board of Judicial Conduct representing the trial court judges in those investigations and disciplinary proceedings.

53.     Cole/Baker Donelson's legal representation in the personal matters for these Davidson County trial court judges includes, but is not limited to, the Davidson County Sixth Circuit trial court of Thomas Brothers, the Fifth Circuit trial Court of Joe P. Binkley, Davidson County Chancery Court-II Chancellor Anne C. Martin, Chancellor

Russell Perkins, Criminal/General Sessions Court Judge Allegra Walker, General Sessions Court Judge Linda Jones, Criminal /General Sessions Court Judge Gayle Robinson and many more. Cole/Baker Donelson's representation of these members of the judiciary Davidson Country trial court, extends to legal representation of those judges' family members and friends.

54. Russell's 2006 litigation against Baker Donelson's client, HSBC, was assigned to the same trial courts and presided over by the same judges and chancellors who were, at the relevant times and thereafter, represented by Cole and Baker Donelson and at the exact same time that Cole and Baker Donelson were appearing in front of these judges that were their own clients.

55. The foregoing facts directly contributed to Russell's inability to obtain licensed counsel in and around Davidson County, Nashville, where she is a citizen and resident.

56. Cole and Baker Donelson had and were continuing to exert their political connections and substantial influence in the legal community through slander and defamation about Russell to prevent Russell from obtaining licensed counsels in Nashville and the nearby areas. The slander and defamation employed by Cole/Baker Donelson had the intended chilling effect on Russell's ability to secure competent licensed counsel.

57. On or about mid-May 2021, Ms. Russell was seeking experienced, competent licensed counsel to represent her in the federal Case No. 3:20-cv-01028, in the United States District Court, Middle District of Tennessee, at Nashville.

58. Russell specifically sought an experienced, skilled, competent out-of-county

licensed counsel litigator with experience in complex litigation who could effectively address her claims that she had filed on November 30, 2020, as a *pro se* plaintiff.

59. Russell's case involved claims for her stolen intellectual properties, economic espionage, theft of trade secrets, theft and infringement of intellectual properties, theft of property subject to copyright, patent, and trademark protection, aggravated identify theft, illegal access and hacking of computer information, revealing and disseminating computer information, defamation, slander and false arrest.

60. Russell was immediately forthcoming and completely transparent with each licensed attorney she spoke with during her efforts to a secure competent capable litigator to represent her in the federal case, specifically including, Killian, Cavett and the law firm Cavett, Abbott & Weiss, PLLC.

61. Russell exercised diligent, reasonable care to determine any conflicts or potential conflicts of interest while seeking to engage licensed counsel to represent her in the subject litigation, including when considering Cavett, Abbott & Weiss, PLLC, and Killian.

62. Russell was also reasonably concerned about the retaliatory actions that had already been taken against her by Cole and Baker Donelson's wide reach in the legal community.

63. Upon Russell disclosing the foregoing network of Cole/Baker Donelson's connections and political influence to Killian and Cavett in Russell expressed those concerns, both Killian and Cavett responded by stating that they were aware of these parties and their licensed counsel of record, Lewis Thomason law firm, in particular,

lead counsel, Dale Bay, for these defendants in Russell's pending federal litigation in which she was seeking representation to address her claims for the theft of her intellectual properties, trade secrets, proprietary confidential information.

64. Killian and Cavett both stated: *"Those are just lawyers, they are not litigators, we're real litigators!"*

65. Russell made it clear that her priority was to protect her trade secrets, proprietary confidential information, inventions and intellectual properties.

66. While proceeding *pro se* in that cause, Russell had already effectively established securing basic initial protections in place to prevent any additional disclosures about further details of her confidential proprietary information which Baker Donelson had attempted to obtain by and through their habitual abuses of discovery to gain even more illegal advantages and further abuse Russell's intellectual properties, confidential proprietary information and trade secrets.

67. The initial protections against disclosure of any additional details of her proprietary information was obtained by Russell during her self-representation early in the litigation around early January-February 2021 and remained in place until August 3, 2021. Those protections were not lost by any act by Russell at any time during her self-representation.

68. The representations on Killian's page on the law firm's website, included, but was not limited to representing that he had been admitted to practice in the Middle District of Tennessee at Nashville. (See p. 2 of EXHIBIT #1).

69. Killian held himself out to be an expert in intellectual property/trade

secret/proprietary confidential information law, criminal law, handling evidence, litigation of complex cases, etc.

70. Russell made it clear that she was only interested in competent, skilled licensed counsel who could get up to speed, already admitted and able to practice in the Middle District Court of Tennessee at Nashville.

71. Killian confirmed, more than once, that he routinely practiced in the Middle District Court of Tennessee, at Nashville, and was well known by his name and reputation by the federal judges in that court.

72. Killian stated that for a fee of $7,500 (Seven thousand five hundred dollars) he would "thoroughly read and review" the subject case, before becoming counsel of record.

73. Russell borrowed the money from a friend, and because of the urgency Killian placed on receiving the money before reviewing the record.

74. Russell timely, in most instances, immediately supplied every single document requested by Killian, in every legal proceeding, for his review in order for him to be able to be fully informed before accepting representation as counsel of record for Russell.

75. It was not until after Russell paid Killian the money, and after he had agreed to accept representation of her in the case, and after several excuses about his delay in filing notice of appearance that Killian finally admitted that he was no longer admitted to practice in the specific court as he had represented and "guaranteed" during conversations, and as stated in the representations on the website.

76. The process of Killian being re-admitted to practice in the Middle District Court

of Tennessee, at Nashville took approximately 3 ½ weeks after Killian agreed to enter his notice of appearance as Russell's counsel of record. Killian entered notice of appearance on or around May 25, 2021.

77. It was not until after Killian withdrew as Russell's counsel that Russell finally discovered that Killian had not practiced in that court for approximately more than one and one-half decades since his last appearance in that court.

78. Before accepting representation of Russell, Killian specifically told Russell that he had conducted a "conflicts of interest check" with his firm, checked with all other licensed attorneys, had spoken directly with Cavett and Abbott, thoroughly discussed representing Russell because he had to obtain Abbot's approval as the firm's managing partner/member and one of the named partners in the law firm.

79. Killian specifically omitted and failed to disclose to Russell that managing partner/member Abbott, as the party who had to approve of Killian's representation of Russell, is, in fact, personal friends with adversarial counsel Dale R. Bay at the law firm of Lewis Thomason.

80. Dale Bay of Lewis Thomason is lead counsel representing defendant Jonathan Cole. Bay's direct supervisor at Lewis Thomason is Lisa Ramsey Cole, defendant Jonathan Cole's wife.

81. Russell later learned, and Killian confirmed through his admissions to Russell, that Killian had been participating in the lunch hour with other licensed attorneys of Cavett Abbott & Weiss's law firm. During these lunch hours, Killian was openly providing detailed information about Russell's case, specific evidence and other client

privileged information, without Russell's knowledge or consent.

82. In addition to Killian's lunch hour violations of Russell's client privilege, during the interim before Killian had been re-admitted to practice in the Middle District Court of Tennessee, at Nashville, and after becoming Russell's counsel of record, Killian conducted numerous phone calls by and between himself and Dale Bay.

83. During calls initiated by Killian to Bay, prior to his re-admittance to practice in the court of jurisdiction of Russell's cause, Killian voluntarily disclosed detailed information and descriptions of specific items of Russell's physical, empirical evidence that had not been disclosed at that time.

84. Killian's disclosures of Russell's documented, physical empirical evidence during his unauthorized phone calls and discussion with adversarial counsel Bay, BEFORE conducting any discovery, including deposing any of the defendants, directly resulted in each of Killian's specific disclosures being placed in discovery demands by Dale Bay AFTER Killian's conversations with Bay.

85. Killian ultimately disclosed the content of his conversations with Bay, to Russell because the defendant's discovery requests demanded evidence that had been previously only known to Russell and Killian as her counsel of record.

86. During Killian's unauthorized conversations and disclosures of specific evidence to adversarial counsel BEFORE conducting any discovery on Russell's behalf, Killian knowingly made exaggerated claims about Killian already being in possession of evidence that Killian knew he did not have at the time of making those exaggerated claims and statements to Bay.

87. Killian falsely represented to Bay, that Killian was **already** in possession of defendant Cole's fingerprints on the ink cartridge that Cole & Carol Tanner had tried to use to replace the ink cartridge they had depleted while making copies on Russell's printer. The cartridge did not fit Russell's printer and been left in Russell's leased space while she was not present.

88. Killian's exaggerations and misrepresentations in which he falsely claimed he was **already** in possession of Cole's fingerprints created unnecessary discovery disputes after each of Killian's improper disclosures to adversarial counsel, Dale Bay, as immediately after each such disclosure made by Killian, Bay placed those specific item disclosed to him by Killian into a discovery demand made by the Defendants.

89. As the direct result of Killian's exaggerations and misrepresentations regarding Cole's fingerprints, and in addition to creating an unnecessary discovery dispute over that issue, Killian further exacerbated the situation by making discovery demands to obtain Cole and Carol & Tom Tanner's DNA.

90. As the direct result of Killian's uncontrolled exaggerations and in his attempt to try to regain control in the uncontrolled situation Killian had himself created by his falsehoods, Killian contacted a former FBI agent, engaged that third party's services without first informing Russell and absent Russell's knowledge, permission or consent.

91. Killian did not advise or inform Russell beforehand about the nature, scope or fees associated with Killian's initiation of services with the former FBI agent who was apparently in private practice of investigatory services.

92. The entire situation initiated by Killian and his exaggerations and

misrepresentations about evidence that he knew he did not yet have and had no reasonable certainty if such evidence could even be obtained, spiraled out of control.

93.     Ultimately, after Killian's withdrawal, Killian knowingly authored a letter to Russell and a separate letter to the former FBI agent from which Killian had apparently obtained services without Russell's authorization after Killian ran up a bill. Killian demanded that Russell pay for the unauthorized services Killian had initiated and obtained without any contract, fees, description of scope of work or services and/or what, if anything had actually been performed by the third-party Killian had unilaterally engaged.

94.     Killian's statements to the third-party former FBI agent in which he disclosed Russell's private phone number and instructed the party to directly contact Russell to demand payment. The former FBI agent, who Russell had never spoken with at any time prior to the call making a demand for payment for alleged services that Russell had not authorized prior to Killian's unilateral engagement and that was directed solely by Killian without input from Russell.

95.     Killian made patently false, defamatory and slanderous statements about Russell to the third-party former FBI agent, in which Killian attempted to paint himself as a *victim* because he was refusing to pay the third-party he alone had initiated contact with and he alone had contracted for services with and was attempting to shift-blame and financial responsibility to Russell.

96.     Killian made similar defamatory, slanderous statements about Russell in his court filings that contained patently false and intentionally inflammatory statements in

his statements in his first motion to withdraw, which was improperly filed in violation of the applicable rules, in which he, once again, attempted to shift blame to Russell alleging she had prevailed on him to act unethically or in violation of the law, which Killian knew to be plainly false.

97.     Killian made a similar unauthorized disclosure and fabricated exaggerated scenario about a stuffed animal that had been in the same part of Russell's rental space. Russell had disclosed only to her counsel of record, Killian, that Carol Tanner had confessed that as part of the explanation for Russell's leased premises being in disarray upon her return from housesitting, one of the items was a stuffed animal (teddy bear) that had been turned face down. Tanner told Russell that while Tanner and Cole were in Russell's space, they believed the bear could be a "nanny cam" recording their actions and their theft of Russell's property. Tanner told Russell to "stop the recording" the teddy bear had been placed face down.

98.     During one of Killian's uncontrolled exaggerations in another of his unauthorized disclosures to adversarial counsel Bay, Killian disclosed all of the details about the scenario.

99.     As had already occurred on a previous occasion in another of Killian's unauthorized violations of Russell's client privilege, Killian exaggerated and made intentional misrepresentations to Bay, telling Bay that the bear, in fact, did record the theft. A statement that Killian unquestionably knew was absolutely false as he spoke.

100.     As had already occurred following other such unauthorized disclosures by Killian to Bay, Bay immediately placed the information into his client's discovery

demands.

101.     Afterward Killian finally disclosed to Russell the foregoing unauthorized disclosures, Killian admitted that he intentionally fabricated and exaggerated to Bay that there was a video recording of the theft. Killian knew there had never been any such video recording.

102.     Killian then tried to persuade Russell to allow the discovery responses to intentionally misrepresent that Bay had 'misunderstood" the type of recording, by falsifying the discovery responses to state and/or imply that there was an audio recording rather than a video recording. Russell refused because the truth was that there had never been either an audio or video recording.

103.     Killian also solicited other outside entities and persons to assist him with Russell's case without first discussing his intentions to do so.

104.     Killian claimed that he had contacts at the Department of Justice and FBI and instructed Russell and one of her witnesses to gather documents together in preparation for a meeting he claimed he had already arranged, to take Russell and the witness to meet with those contacts, in person, to initiate an investigation into the criminal activity by Cole and Baker Donelson.

105.     Cavett and Killian scheduled a conference call between themselves, Russell and witness, Lisa O'Dell, telling them they were ready to go to the FBI. Russell and O'Dell stated they had gathered the documents as instructed prior to the conference call and were told to be ready for the meeting on the following Monday.

106.     During that call, in July, 2021, Cavett and Killian stated that "Cole is going to

fucking federal prison!"

107.    At the time, in late May, 2021 that Killian entered notice of appearance in the subject federal case, Russell was still continuing in the state case against HSBC, proceeding *pro se* in the third appeal filed in 2020.

108.    Killian informed Russell that he had discussed her federal case with Cavett, and had provided Cavett with information about the state case which at that time was pending in the Tennessee Court of Appeals, and both of them had gone to Abbott, the managing partner/member of Cavett Abbott & Weiss, PLLC, and obtained Abbott's permission and approval for Cavett to represent Russell in the appeal and state case.

109.    Cavett and Killian had agreed and offered to take both cases on contingency.

110.    The estimated value of Russell's intellectual properties, confidential proprietary information, trade secrets are approximately $600 Million, (six hundred million dollars) which is the amount of damages, plus punitive damages in the federal case.

111.    The damages sought in the state case against HSBC is $500 Million (five hundred million dollars) plus punitive damages.

112.    During the entire time that Russell had been proceeding *pro se,* no sanctions had been filed because no facts existed that could support or justify filing of any sanctions by any defendant in either the federal case or the state case.

113.    Within weeks – less than 90 (ninety) days of Killian and Cavett becoming counsels of records, sanctions had been filed by the defendants in both cases.

114.    Killian engaged licensed counsel to represent him to defend him against the sanctions. Killian's withdrawal from the case removed the sanctions from him and left

the burden of defense, responsibility and financial liability for those sanctions directly

on Russell. Those sanctions are still pending and Russell is still obligated to address the

sanctions that were filed while he was counsel of record.

115.     Cavett was also sanctioned in the state case. Cavett did not successfully cause

the sanctions to be dismissed. Instead, Cavett managed to only cause the still pending

sanctions to be deferred and delayed until the end of the case. Cavett's withdrawal

removed the sanctions from him and left the burden for defense, responsibility and

financial liability directly on Russell.

116.     William Killian knew that he had been diagnosed with Parkinson's and was

experiencing severely diminishing capacity, both in his ability to think clearly, articulate

with reasonable clarity and compose coherent pleadings.

117.     John Cavett and Barry Abbott and all other licensed attorneys at the Cavett,

Abbott & Weiss PLLC law firm, were all also well aware and knew about the severity of

Killian's diminished capacity.

118.     Cavett knew that Killian was not capable of composing, authoring, preparing

coherent legal documents which are necessary in the course of practicing law.

119.     Cavett was not only aware of Killian's inability to continue practicing law,

Cavett prepared documents for Killian as the direct result of Killian's incapacity, and

Killian affixed his signature to those pleadings, including, but not limited to Russell's

Amended Complaint in the federal case.

120.     Killian, Cavett and Abbott all three participated in conspiring to commit fraud,

and did commit fraud by failing and refusing to disclose the critical facts to Russell

about Killian's medical diagnosis, which Cavett and Abbott both knew and personally observed that Killian was suffering from severely diminished mental capacity and competency such that he was rendered incapable and unable to competently represent Russell in the legal proceedings they had discuss and Abbott had personally approved.

121.    Cavett admitted to Russell that he was knowledgeable of Killian's severe diminished mental capacity. Cavett knew that Killian was not physically or mentally able to present cogent oral argument at any hearing.

121.    Cavett and Abbott took steps to insulate themselves from potential liabilities that they reasonably anticipated would arise from Killian's incompetence and mental diminishment, by entering into agreements between and amongst themselves to attempt to construct a wall between themselves and Killian's cases.

122.    Cavett and Abbott knew that Killian had a past history of sexual harassment and had been the subject of complaints filed at the Board of Professional Responsibility by several females Killian had sexually harassed.

123.    On August 3, 2021, there was a hearing in the federal case. Russell was unable to personally attend due to undergoing recent surgery.

124.    Killian had, on several occasions, engaged in discussions with Russell's friend and business acquaintance, the same party who happened to be a witness in the federal case. Killian expressed interest in a luncheon meeting with Lisa O'Dell to discuss an invention that he had invested in. They met prior to the August 3, 2021 hearing that same afternoon. O'Dell and Killian met in Nashville for lunch and walked together over to the federal courthouse to attend the hearing.

The transcript of the hearing bears out that Killian is mentally diminished and incompetent and was incapable of presenting cogent oral argument at the hearing.

125.     Killian had arrived on August 2, 2021 and had attended a meeting at the law office of Lewis Thomason, with Dale Bay.

126.     On information and belief, during Killian's meeting with Bay at the Lewis Thomason law offices, Bay threatened Killian with sanctions and handed him a large box filled with "exhibits" Bay alleged were in support of the motion for sanctions that had not been filed, at that time.

127.     Although, later Killian first denied and then admitted the August 2, 2021 meeting with Bay.  Killian also misrepresented his actions during that meeting. He was not prepared and was ineffective counsel, unable to coherently present facts and incapable of present cogent oral argument at the August 3, 2021 hearing.

128.     Killian, had demanded and Russell had paid, in full, the fee of $7,500 (seven thousand five hundred dollars) for the expressed purpose stated by Killian which was to "thoroughly read and review the file, law and cases" in order that he could be familiar and knowledgeable about Russell's intellectual properties, trade secrets, proprietary confidential information and all relevant issues in the case.

129.     The transcript of August 3, 2021, contains proof that Killian lacked a basic, fundamental understanding about Russell's intellectual properties which were at the center of the hearing.

130.     As the direct result of Killian's incompetency and diminished mental status, he was incapable even sustaining the stayed status to prevent further losses of information

about her confidential proprietary, trade secrets and inventions, the status that Russell had established during her self-representation.

131.    At the hearing on August 3, 2021, Killian was unable to prevail on a single issue and as the direct result of his incompetence and failures, left Russell's case in a grave irreparable status and created problems, complications in discovery, diminished the value of Russell's empirical documented and physical evidence and exposed Russell to additional damages from which she is unlikely to recover.

132.    The August 3, 2021 hearing transcript references a hearing that occurred on July 22, 2021. Killian concealed that hearing from Russell and as of the date of filing this Verified Complaint, Russell has not been advised about the details of that hearing.

133.    After Killian's withdrawal and after he knowingly made false statements in his first motion to withdraw (which he had to file again because the first motion to withdraw was filed in violation of applicable rules and improperly) with the intent to defame and slander Russell.

134.    Killian knew his false statements alleging that Russell had prevailed on him to act illegally or unethically were patently false. Killian likewise knew that those false defamatory, slanderous statements were intended to undermine Russell's credibility as he had threatened to do if Russell ever disclosed Killian's sexual harassment of her.

135.    Killian filed his first motion to withdraw on August 20, 2021.

136.    Russell did not object to Killian's withdrawal. Russell's only objection to the motion was the false disparaging language with Killian intended to paint Russell in a false light through defamatory insinuation.

137. Killian filed his second motion to withdraw on or about September 7, 2021.

138. Russell immediately began seeking to cause Killian to produce her entire file. And continued trying since the entry of the October 19, 2021 court order required Killian to produce the file by October 22, 2021.

139. Killian engaged licensed counsel and knowingly made intentionally false representations about the content of the box of documents and blank pages that had been placed in a box, weighing 67 lbs., and shipped to Russell, under the guise of the contents contained therein, constituting the actual documents in Russel's file.

140. The box Killian had delivered to Russell on Friday, October 22, 2021, contained a mish-mash of unorganized random papers, redundant copies and copies of copies of the same identical document. Fronts of documents were copied with an incongruent unrelated document on the back of the same page, email threads have been altered, exclude replies and/or content that relies upon referenced attachments that were not attached or included elsewhere among any of the other random unorganized documents and missing hearing records that were referenced but not included.

141. Killian has now had excessive time to produce the actual contents of Russell's file and has consistently failed and refused to do so at any time.

142. The numerous filings made by Russell making good faith efforts to obtain her file, each time extended the opportunity to Killian to mitigate the damages he knew he had caused and is continuing to cause Russell which directly continues to damage Russell.

143. At any time Killian could have, but simply did not produce Russell's file, and by

extension, Killian has refused to attempt to mitigate his own liability.

144.    Portions of the incomplete, altered emails threads contain the direct connection of an email entitled as being sent from Barry Abbott to Dale Bay about Russell's case.

145.    Russell has never met or personally spoken with Barry Abbott about any matters in her case. It is unknown what Abbott communicated to his friend and adversarial counsel in Russell's case.

146.    Russell never authorized any communication from Barry Abbott to any party about her case, specifically and particularly, adversarial counsel, Dale Bay, for any reason.

147.    As of the date of this Verified Complaint suing Barry Abbott individually and in his capacity as managing partner/member in the law firm Cavett Abbott & Weiss, PLLC., Russell has never received a copy of any of the written communications between Abbott and Bay or Abbott and any other party regarding Russell's case.

148.    Russell was not sent a copy of the email from Abbott to Bay as the evidence in the portion of the file proves occurred.

149.    Both Cavett and Abbott knew that Killian was severely mentally diminished and allowing Killian to continue advertising legal services by and through Cavett Abbott & Weiss, PLLC's website was misleading, misrepresenting and failed to disclose Killian condition constitutes a danger to his clients and himself and is harmful to the unsuspecting public/consumer seeking legal services from competent licensed counsel.

150.    During Killian's representation of Russell, without Russell's knowledge,

permission or authorization, Killian unilaterally decided to and did disclose client privileged information about Russell's intellectual properties, confidential proprietary information, trade secrets to another third-party to a party to which he referred to only by the name "V".

145.    Killian attempted to force Russell to disclose additional details about her intellectual properties and confidential proprietary information and trade secrets to a person he placed on a telephone call, in another of Killian's violations of Russell's client privilege.

146.     Russell later learned that Killian was not an expert in intellectual property law as he had misrepresented to Russell, which Killian knew was Russell's primary concern in the federal case.

147.    Killian had also associated himself with another law firm, under the title of *"Of Counsel"*. The party Killian introduced only as "V" was apparently associated with the entirely separate law firm.

148.    Killian attempted to shift responsibility to "V" to repair the damages he had caused by his incompetence during the August 3, 2021 hearing and thereafter.

149.     Russell asked Cavett directly as to why they had allowed Killian to remain on Cavett Abbott & Weiss, PLLC's website. Cavett admitted that there was an obvious financial benefit to having a former U. S. Attorney on their team.

150.    Russell's claims against Killian and the law firm Cavett Abbott & Weiss, PLLC for Killian's sexual harassment, are described in Russell's affidavit that has been filed under seal.

151.     Killian told Russell that on the day that Dale Bay and Jordan Scott visited him at the Cavett Abbott & Weiss, PLLC's law offices in Chattanooga, Tennessee, they delivered a box to him that he had not opened and did not intend to open and did not know contents contained in the box.

152.     Killian told Russell that he had instructed his assistant to push the box into the closet where it had remained, unopened since in his possession.

153.     On an earlier occasion, Killian informed Russell that he had discussed with Dale Bay different premises and circumstances under which Russell's stolen property could be returned to Killian "without any questions asked".

154.     Killian then described to Russell that he had suggested to Bay that the defendants could "drop off" Russell's stolen property to the Cavett, Abbott & Weiss PLLC's law offices, "without leaving a note" and "just anonymously drop it off".

155.     As with other unauthorized unorthodox unsound suggestions and actions by Killian, his statements in this regard were never discussed with Russell before he had already discussed and made such statements to defendant's counsel to encourage these parties to merely drop of Russell's stolen property.

156.     When Killian matter-of-factly told Russell that he had made such a suggestion to Bay, Russell reminded Killian that in addition to the outlandish nature of such actions, that Killian could not accept Russell's belongings because Killian had no possible means of identifying Russell's belongings, did not know the full and complete content of the boxes that had been stolen, did not have an inventory list, did not know and would not be able to recognize Russell's handwritten notes, drawings, etc.

157.    After Russell pointed out the obvious as stated above, Killian laughed and said, "Well, I guess I didn't really think about that".

158.    After learning that Bay delivered a box to Killian that Killian had refused to examine the contents of and did not know what was in the box, and had, instead, directed his assistant to push it into the closet, Russell is reasonably concerned about the contents of the box and what other pertinent critical facts and documents Killian has in his possession, in addition to the missing documents from Russell's file.

159.    Cavett knew that Killian had placed the unopened box in the closet because Killian told Cavett the same thing, according to to Cavett's admissions to Russell.

160.    During the course of Cavett's representation of Russell in the state case and court of appeals in the third appeal, Cavett delayed filing the brief in the appeal and filed a day after the deadline.

While it is true that Cavett took action to remedy his late filing, his filing did not contain the information and issues that he discussed with Russell.

161.    Cavett admitted to Russell that he forgot about certain relevant issues and failed to include those in the brief he prepared at the last minute.

162.    Cavett had asked Russell to send him the exact cites and language in specific portions of certain documents. Russell immediately did exactly as Cavett asked. Cavett still failed and refused to include those specific items in the brief that he knew and/or should have known was insufficient and inadequate.

163.    Cavett knew that he had failed to properly thoroughly prepared the brief he filed at the last minute, because he specifically asked Russell to send him the additional

information with Cavett's promise to include the additional information he had requested. Cavett never included the additional information he requested and caused Russell to locate and send to him for the purpose Cavett led Russell to believe he needed the additional information.

164. No one at the law firm of Cavett Abbott & Weiss, PLLC, completed a single legal service or action they agreed to take on behalf of Russell.

165. Every single legal service, task and/or action taken by any licensed counsels at the Cavett, Abbott & Weiss, PLLC law firm proved to force Russell to incur more and additional damages than she had when she came to them seeking legal services.

166. Killian's relationship with Cavett Abbott& Weiss, PLLC as presented on the law firm's website, as well as, the ongoing misrepresentations made by the actions, statements and conduct of John Cavett and Barry Abbott are contrived to deliberately mislead the unsuspecting legal consumer and are consistent with deceptive business practices and intentional acts of fraud, fraudulent concealment, intentional misrepresentation, conspiracy to commit fraud, obstruction of justice and double-dealing for financial benefit of Cavett Abbot & Weiss, PLLC and Killian.

167. Cavett Abbott & Weiss, PLLC and those acting under the banner of their name, took affirmative steps to prevent Russell from discovering the truthful facts about Killian's mentally diminished capacity, sexual harassment history and his incompetence which renders him ineffective as legal counsel, these wrongs by these parties, individually and collectively, was of such a nature as to be self-concealing.

168. John Cavett and Barry Abbott knew and discussed ways in which to insulate

themselves from the very liability and the risks they knew existed while, at all times, intentionally exposing Russell to all of those risks and subjecting her to the same losses, damages and liabilities that they, as licensed attorneys engaged in the practice of law, intentionally conspired to avoid.

169.    Cavett, Abbott & Weiss, PLLC, in conspiracy with Killian chose to blur the lines of their association when it directly benefitted their financial potentials and then chose to try to draw a bright line as to liability and risks, which is conspiracy to commit fraud.

170.    Killian solicited, demanded and received money under false pretenses of providing competent legal services when he knew he could not fulfill his representations of competency.

171.    Cavett Abbott & Weiss, PLLC, along with Killian, Cavett and Abbott, each acted individually and collectively to fraudulently conceal and suppress material facts; they had knowledge of the material facts; they concealed and suppressed these material facts with the intention to cause Russell to rely on their misrepresentations while omitting and refusing to disclose facts that they had taken steps to protect themselves from.

172.    The defendant's actions, individually and collectively and in concert with each other and others with whom they have communicated, including, but not limited to, the adversarial counsels in the subject case, and are the direct and proximate cause in fact of Russell's injuries, damages and losses and constitute violations of state and federal laws.

173.    Deprivation of Rights 42 USC 1983 – Defendants conspired to prevent Russell from accessing fundamental due process by their actions, these defendants conspired to and did deprive Russell of timely access to fundamental due process damaging Russell's

evidence and delaying her ability to proceed without hinderance, for the expressed purpose of obstructing justice for the direct benefit of their friends who are also licensed attorneys.

174.    Sexual Harassment

175.    Slander and defamation.

176.    Civil Conspiracy - Tennessee Common law

177.    Breach of Fiduciary Duty and Duty of Loyalty – Tennessee Common law

178.    Legal Malpractice

179.    Fraud

180.    False advertising, Deceptive business practices

181.    Fraudulent concealment, intentional misrepresentations with intent to cause reliance.

182.    Injunctive Relief – Fed. R. Civ. P. 65:  Federal Common Law

Russell requests injunctive relief against the defendants individually and collectively which if not granted will cause her to suffer irremediable injuries.


Plaintiff Russell reserves the right to amend this complaint as evidence may prove necessary in the interest of justice.

## **REQUEST FOR RELIEF**

1.    Temporary and permanent orders requiring the Defendants to return all of her records, files, documents, personal and business records and any and all personal property that has been delivered to them by the defendants and adversarial counsels in

the subject case.

2.     Issue process to be served on each defendant requiring them to answer this Verified Complaint in accordance with law.

3.     Conduct a jury trial in this matter, a jury of 12 (twelve).

4.     Enter judgement against William C. Killian, John C. Cavett, Barry L. Abbott, and the law firm of Cavett, Abbott & Weiss, PLLC, jointly and severally, for damages in the amount of SIX HUNDRED MILLION ($600,000,000) DOLLARS.

5.     Enter judgement for punitive damages against the defendants, jointly and severally.

Respectfully submitted,

Deborah Russell, PLAINTIFF, *pro se*
P. O. Box 121333, Nashville, TN 37212
615-946-4484

## <u>VERIFICATION OF COMPLAINT</u>

STATE OF TENNESSEE

DAVIDSON COUNTY

I, Deborah Russell, as Plaintiff and witness in this cause, being duly sworn, verify this Complaint.

I have read and personally prepared the foregoing Complaint and state that the Information contained therein is true and correct.

DEBORAH RUSSELL

Sworn to and subscribed before me this __2__ day of August, 2022.

NOTARY PUBLIC

My Commission Expires: __7/03/2023__

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been sent via the U.S. Postal Service, postage prepaid to:

DEFENDANT  William C. Killian
801 Broad Street, Suite 428
Chattanooga, TN  37402

DEFENDANT John C. Cavett
801 Broad Street, Suite 428
Chattanooga,TN  37402

DEFENDANT Barry L. Abbott
801 Broad Street, Suite 428
Chattanooga, TN  37402

DEFENDANT  Cavett Abbott & Weiss, PLLC
c/o Registered Agent for Service of Process
Barry L. Abbott
801 Broad Street, Suite 428
Chattanooga, TN  37402

On this _____ day of _____, 2022.

_____